



BC

RECEIVED
8/3/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
MPV

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MARCOS SANCHEZ,** | **1:26-cv-09210** |
| **Plaintiff,** | **Judge Edmond E. Chang** |
| | **Magistrate Judge Albert Berry, III** |
| **v.** | **Random/Cat. 2** |
| | Case No. _____ |
| **CITY OF CHICAGO,** | |
| **Defendant.** | |

**COMPLAINT AND JURY DEMAND**

Plaintiff Marcos Sanchez, appearing pro se, for his Complaint and Jury Demand against Defendant City of Chicago, alleges upon personal knowledge as to his own actions and upon information and belief as to all other matters, as follows:

**INTRODUCTION**

1. This action arises from Defendant City of Chicago's alleged use of governmental authority to retaliate against Plaintiff after he exercised rights protected by the First Amendment by filing and pursuing civil litigation, petitioning governmental agencies, reporting alleged governmental misconduct, and participating in judicial proceedings.

2. Plaintiff alleges that City attorneys and other City personnel used their governmental authority to intimidate Plaintiff, interfere with his employment, threaten criminal investigation or prosecution, and otherwise retaliate against him because of his protected activity.

3. Plaintiff further alleges that the challenged conduct was undertaken pursuant to official municipal policies, customs, or decisions of final policymakers, or was knowingly authorized or ratified by officials possessing final policymaking authority, giving rise to municipal liability under 42 U.S.C. § 1983.

4. Plaintiff asserts claims under 42 U.S.C. § 1983 for violations of the First and Fourth Amendments, together with related Illinois-law claims arising from the same course of conduct.

2

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

6. This Court has supplemental jurisdiction over Plaintiff's related Illinois state law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of the same nucleus of operative facts as Plaintiff's federal claims.

7. Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because Defendant City of Chicago is located within this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Northern District of Illinois.

**PARTIES**

8. Plaintiff Marcos Sanchez is an individual residing in the State of Illinois and is the person bringing this action.

9. Defendant City of Chicago is a municipal corporation organized under the laws of the State of Illinois and, at all relevant times, acted through its departments, officials, employees, agents, attorneys, and representatives under color of state law.

**FACTUAL ALLEGATIONS**

10. Unless otherwise stated, the allegations in this Complaint concerning Plaintiff's own experiences, observations, communications, and actions are based upon his personal knowledge. Allegations concerning matters outside Plaintiff's direct knowledge are made upon information and belief based upon the specific facts alleged herein and reasonable inferences arising from those facts, particularly where the relevant information is within Defendant's possession, custody, or control. The events alleged herein occurred primarily between 2023 and December 2025. Plaintiff alleges these events collectively because their timing, participants, content, and asserted governmental connections provide relevant factual context for the constitutional and state-law claims alleged below.

11. On or about March 19, 2025, Plaintiff appeared for an audio- and video-recorded deposition conducted in connection with prior litigation involving the City of Chicago. During that deposition, Plaintiff personally heard statements made by Assistant Corporation Counsel Tiffani E. Mims and Philip Santell, attorneys employed by the City of Chicago Department of Law,

Employment Litigation Division. Plaintiff alleges that the recording is expected to corroborate the statements, context, timing, and identities of the speakers described in paragraphs 12 through 29.

12. At the beginning of the March 19, 2025 deposition, Assistant Corporation Counsel Tiffani E. Mims, while standing next to Assistant Corporation Counsel Philip Santell and in what appeared to Plaintiff to be a room filled with attorneys from the City of Chicago Department of Law, pointed in Plaintiff's direction and stated, in substance, "This is the one the FBI is going after."

13. During the deposition, Plaintiff personally heard Assistant Corporation Counsel Tiffani E. Mims state, in substance, that Plaintiff's children would be left "orphans." Plaintiff also heard Mims state, in substance, that Plaintiff was under federal and state investigation, that criminal charges against him were being considered, and that efforts had been made to have him arrested but that they "couldn't get him for anything."

14. During a discussion of Plaintiff's personal tax matters, Santell stated, in substance, that Plaintiff prepared his own tax returns and that "they don't think he cheated." Mims responded, in substance, "You can't do your own taxes," and "What is he, an accountant?"

15. Plaintiff further heard Mims state, in substance, while referring to Plaintiff, "Look at his eyes; he probably has guns hidden somewhere." Plaintiff then heard Santell respond, in substance, "No, they checked."

16. During the March 19, 2025 deposition, Mims referred to Plaintiff's cat, and Santell stated, in substance, that Plaintiff had a scar on his left arm resulting from a childhood stabbing. Mims then stated, in substance, "That's why he's so fucked up." Mims, Santell, or both also referred to specific items located inside Plaintiff's residence. Plaintiff had not disclosed those facts during the deposition, in discovery, or in any other communication with Defendant, and Plaintiff's cat was not present at the deposition.

17. The specificity and nonpublic nature of those statements plausibly support the inference that City personnel, or persons communicating or coordinating with them, had obtained or received information concerning Plaintiff's residence, possessions, personal history, or activities before the deposition. Plaintiff alleges upon information and belief that City personnel acquired, received, reviewed, disclosed, or used that information. The source, means of acquisition, persons involved, and existence of any legal authorization are matters principally within Defendant's or other governmental entities' control.

18. During the same deposition, Plaintiff heard Santell state, in substance, that he had spoken with the Federal Bureau of Investigation ("FBI") by telephone concerning Plaintiff.

19. Plaintiff also heard Mims state, in substance, while referring to individuals outside the building, "Those aren't construction workers; they're FBI agents."

20. Plaintiff alleges that the statements concerning FBI involvement, federal and state investigations, possible prosecution, arrest, taxes, firearms, and his children were intended to intimidate and retaliate against him because of his protected activity. The statements were allegedly made during an official deposition convened and conducted on behalf of the City of Chicago by Assistant Corporation Counsel Mims and Santell, who appeared as attorneys for the City, exercised authority assigned to them by the City, used the City's Department of Law offices, personnel, information, and litigation processes, and addressed matters that they represented as involving governmental investigations and law-enforcement authority. In those circumstances, Plaintiff reasonably understood the statements as invoking actual or apparent governmental power rather than expressing personal opinions unrelated to City business. Their governmental setting, source, content, and asserted connection to law-enforcement activity materially increased their coercive and intimidating effect and caused Plaintiff to fear for his liberty, family, livelihood, and reputation.

21. During the deposition, Mims and Santell questioned or discussed whether Plaintiff had fraudulently applied for or obtained a Paycheck Protection Program ("PPP") loan. During that discussion, Plaintiff heard Santell state, in substance, "No." Plaintiff alleges that the meaning and context of Santell's response are reflected in the audio-and-video recording of the deposition.

22. Mims questioned why Plaintiff had repeatedly searched for information concerning PPP loans and why he continued researching the subject if he had not fraudulently obtained such a loan. During that discussion, Plaintiff heard Santell state, in substance, "I don't know." Plaintiff alleges that he conducted those searches after learning of reports that City employees, including employees assigned to the Chicago Department of Aviation, had fraudulently obtained PPP loans while remaining employed by the City.

23. Plaintiff also heard discussion of a Google search he had conducted asking, "Was Chicago the most corrupt city in the world?" Plaintiff alleges that Mims responded, in substance, "Yes, we are."

24. The discussion of Plaintiff's specific Internet-search queries, which Plaintiff had not disclosed or produced, plausibly supports the inference that City personnel or persons acting in coordination with them had obtained or received information reflecting Plaintiff's nonpublic Internet-search activity before the deposition.

25. Plaintiff did not consent to governmental access to or acquisition of those records and received no notice of any warrant, subpoena, court order, discovery request, or other legal process seeking or authorizing access to records containing the specific queries discussed during the deposition.

26. Plaintiff alleges upon information and belief that one or more governmental actors obtained or accessed records reflecting his Internet-search activity and transmitted or disclosed information derived from those records to City personnel. Plaintiff further alleges that City personnel requested, directed, facilitated, participated in, or knowingly coordinated with that access, acquisition, transmission, or disclosure.

27. Plaintiff further alleges that the precise nature, scope, source, and means of any communications, investigative requests, investigative activity, coordination, or acquisition, receipt, review, disclosure, or use of Plaintiff's nonpublic electronic information remain matters principally within Defendant's and other governmental entities' possession, custody, or control.

28. Such information may include records reflecting Plaintiff's Internet-search activity and, to the extent supported by facts developed through discovery, browser records, text-message content or records, telephone communications, call records, or comparable digital information. The existence, scope, and constitutional sufficiency of any warrant, subpoena, court order, consent, discovery request, or other legal process authorizing the acquisition or use of such information are likewise matters principally within governmental possession and control.

29. During the deposition, Plaintiff personally heard statements indicating that Mims, Santell, or other Department of Law personnel possessed information concerning Plaintiff's employment at Northwestern Medicine and Security Manager Vincent Page. Mims stated, in substance, "No one likes you at Northwestern Medicine." Defendant previously had obtained Plaintiff's employer information through written discovery, but Plaintiff had not disclosed that Northwestern Medicine personnel disliked him, had complained about him, or were dissatisfied with his employment.

30. The specificity of Mims's statement, together with the references to Vincent Page and the surrounding discussion of criminal investigation, arrest, firearms, taxes, and Plaintiff's private activities, plausibly supports the inference that City personnel communicated with Northwestern Medicine personnel or received information from them concerning Plaintiff. Plaintiff alleges upon information and belief that the communications were undertaken or used to intimidate him, jeopardize his employment, or retaliate against him for pursuing protected activity. The participants, content, timing, and means of those communications are principally within Defendant's and Northwestern Medicine's possession.

31. Plaintiff resigned from Northwestern Medicine on April 1, 2025, thirteen days after the deposition. Plaintiff alleges that the threatening statements, the apparent use of nonpublic information, and the asserted communications concerning his employment made continued employment objectively appear unsafe and untenable because he reasonably feared further governmental accusations, reputational injury, or interference with his livelihood. Plaintiff alleges that Defendant intended, foresaw, or knowingly risked that result and that the challenged conduct was a substantial factor in causing his resignation.

32. Following the March 19, 2025 deposition, Defendant's alleged conduct caused Plaintiff to fear for his liberty, family, livelihood, and reputation and substantially contributed to the deterioration of his mental health and the injuries alleged throughout this Complaint.

33. Plaintiff settled his then-pending ADA civil action on or about May 12, 2025. The statements concerning criminal investigation, possible prosecution, arrest, firearms, taxes, and Plaintiff's children caused him to fear that continuing the litigation would expose him and his family to further retaliation. Before the settlement was finalized, Plaintiff informed his attorney by email that he did not wish to continue the action because of those fears. Plaintiff alleges that Defendant's conduct materially affected his settlement decision and caused him to accept substantially less than he otherwise would have accepted.

34. Plaintiff alleges that Defendant engaged in the challenged conduct because he filed and pursued civil litigation against the City, petitioned courts and governmental bodies for redress, participated in judicial and administrative proceedings, and reported alleged governmental misconduct and matters of public concern. Plaintiff's prior disability-accommodation requests and related administrative filings also placed Defendant on notice of Plaintiff's documented mental-health condition and particular susceptibility to serious emotional injury. Plaintiff relies upon those accommodation-related matters as evidence of Defendant's knowledge and intent, except to the extent that a particular filing independently constituted activity protected by the First Amendment.

35. Plaintiff further alleges that, during 2023, a treating physician determined that he was disabled due to mental health conditions and that he requested reasonable accommodations under the ADA. Plaintiff alleges that Defendant knew or should have known of his disability and increased susceptibility to emotional harm but nevertheless continued the retaliatory conduct described in this Complaint.

36. On March 21, 2025, two days after the deposition, Plaintiff was hospitalized for suicidal ideation and depression. Plaintiff alleges that the threats, intimidation, and disclosure or use of apparently nonpublic information during the deposition were a substantial factor contributing to

the acute deterioration of his mental health, hospitalization, continuing treatment, and resulting economic and noneconomic injuries.

37. On or about April 29, 2025, Plaintiff received an email from Chicago Police Officer Irvinder K. Perez regarding Plaintiff's Firearm Owner's Identification ("FOID") card.

38. At approximately the same time, Plaintiff observed a marked Chicago Police Department vehicle parked outside his residence. Based upon Plaintiff's personal observations, Officer Irvinder K. Perez was present in or associated with that vehicle.

39. The communication directed Plaintiff to surrender all firearms, although Plaintiff owned no firearms requiring surrender.

40. The communication further indicated that Plaintiff would be charged with a criminal offense. Plaintiff alleges that this communication increased his fear of criminal prosecution and contributed to the damages alleged in this Complaint.

41. Between January 2024 and December 2025, Plaintiff personally observed marked Chicago Police Department vehicles parked near his residence on multiple occasions. Plaintiff does not know the official reason for each vehicle's presence and does not allege merely from the presence of a police vehicle that unlawful surveillance necessarily occurred. He alleges, however, that the frequency, timing, and circumstances of certain incidents, when considered together with the statements made during the March 19, 2025 deposition and the April 29, 2025 FOID-related incident, contributed to and reinforced the intimidation alleged herein.

42. Before the March 19, 2025 deposition, Plaintiff personally observed a marked Chicago Police Department vehicle repeatedly travel near and around his residence. During one encounter, Plaintiff made direct eye contact with the officer and heard the officer state, in substance, "He just looked right at me." Plaintiff alleges that this statement indicated the officer was observing or discussing Plaintiff specifically. Plaintiff further alleges, upon information and belief, that, when considered together with the other allegations set forth in this Complaint, this encounter was consistent with governmental monitoring or information-gathering concerning Plaintiff. The officer's identity, assignment, purpose, and communications are presently unknown and are matters expected to be established through discovery.

43. The alleged conduct occurred over an extended period and involved attorneys and personnel associated with more than one City department. Plaintiff alleges, upon information and belief, that the nature of the information discussed, the references to communications with law-enforcement personnel and Plaintiff's employer, and the subsequent City-related conduct

plausibly support an inference of communication or coordination extending beyond the independent conduct of a single municipal employee.

44. Plaintiff further alleges, upon information and belief, that personnel associated with the Department of Law, the Chicago Police Department, the Chicago Department of Aviation, or other governmental entities communicated concerning Plaintiff, exchanged or used information about him, or coordinated one or more of the actions described herein. Plaintiff bases that allegation on the specific statements and events described in paragraphs 11 through 42, rather than solely on the fact that personnel from different departments were involved.

45. Plaintiff does not yet know the identities of every participant, the precise content of the communications, the source of the information discussed during the deposition, or the existence and scope of any authorization or approval. Those matters are principally within the possession of Defendant or the governmental entities involved. Relevant evidence is expected to include the deposition recording, Department of Law communications and files, CPD records, electronically stored information, records concerning communications with Northwestern Medicine, and testimony from the persons involved. At or near the conclusion of the deposition, Santell requested a copy of the video recording. Plaintiff alleges, upon information and belief, that the Department of Law thereafter obtained or maintained a copy of that recording.

## COUNT I
## 42 U.S.C. § 1983 — FIRST AMENDMENT RETALIATION AND MUNICIPAL LIABILITY

46. Plaintiff realleges and incorporates paragraphs 1 through 45.

47. Plaintiff engaged in activity protected by the First Amendment by filing and prosecuting nonfrivolous civil actions against governmental defendants, petitioning courts and governmental bodies for redress, appearing and participating as a litigant and witness in judicial proceedings, and reporting alleged governmental corruption, misconduct, and matters affecting the public. Plaintiff alleges that he undertook those activities as a private citizen and litigant, outside any duty he owed as a City employee. Plaintiff relies only upon those petitions, statements, reports, and proceedings that are protected under the First Amendment under the circumstances in which they occurred.

48. Defendant City of Chicago, through its attorneys, employees, agents, and representatives acting under color of state law, knew of Plaintiff's protected activities because those activities were directed toward or involved the City and its departments.

49. After acquiring knowledge of Plaintiff's protected activity, City personnel allegedly used actual or apparent governmental authority to threaten or communicate the prospect of criminal investigation, prosecution, and arrest; reveal or discuss apparently nonpublic personal and digital information; interfere with Plaintiff's outside employment; and undertake the related conduct alleged above. Plaintiff alleges that the challenged conduct was materially adverse not because the City attorneys merely criticized him or expressed unfavorable opinions, but because they invoked governmental investigative and prosecutorial power, communicated alleged knowledge of private information, referred to unsuccessful efforts to secure his arrest, threatened consequences affecting his children, and allegedly extended the retaliation to his livelihood and interactions with law-enforcement personnel.

50. The retaliatory conduct alleged herein would deter a person of ordinary firmness from continuing to exercise rights protected by the First Amendment. Its deterrent effect was materially increased because the alleged threats were made by government attorneys during an official deposition, invoked federal and state investigative and prosecutorial authority, referred to alleged efforts to secure Plaintiff's arrest, threatened consequences affecting his children, demonstrated alleged knowledge of private information, and were followed by employment-related and FOID-related events.

51. Plaintiff alleges that his protected litigation and petitioning activity was at least a motivating factor in the challenged conduct. The principal threats were made during a deposition necessitated by Plaintiff's litigation against the City, by the attorneys defending the City in that litigation, while they possessed direct and contemporaneous knowledge that Plaintiff was continuing to prosecute claims and seek governmental redress. The alleged statements expressly concerned governmental investigation, attempted arrest, prosecution, and information about Plaintiff that City personnel allegedly obtained or used while defending against his claims. The temporal, institutional, and subject-matter connection between the protected litigation and the alleged threats, together with the subsequent employment and FOID-related events, plausibly supports an inference of retaliatory motive. Plaintiff alleges that the challenged actions would not have occurred in the same manner absent his protected activity.

52. As a direct and proximate result of Defendant's alleged retaliation, Plaintiff suffered the injuries and damages alleged throughout this Complaint, including hospitalization, loss of employment, emotional distress, and impairment of his constitutional rights.

53. Plaintiff alleges that Assistant Corporation Counsel Tiffani E. Mims and Philip Santell personally participated in the conduct alleged to have occurred during the March 19, 2025 deposition while exercising authority assigned to them by the City and performing official litigation functions on the City's behalf. Plaintiff further alleges, upon information and belief,

that additional City personnel participated in, directed, authorized, approved, or affirmatively adopted the challenged conduct and its retaliatory objective.

54. At the relevant time, Mary B. Richardson-Lowry served as Corporation Counsel and headed the City of Chicago Department of Law. Plaintiff alleges, upon information and belief, that the challenged Department of Law conduct was undertaken pursuant to a decision made by the municipal official or body possessing final policymaking authority over the particular governmental actions at issue, or pursuant to authority lawfully delegated to an official whose decisions concerning those actions were not subject to meaningful further municipal review.

55. In the alternative, to the extent applicable Illinois and Chicago law and the evidence establish that final policymaking authority over the particular actions at issue resided elsewhere, Plaintiff alleges that such authority was exercised by the Mayor, the Chicago City Council, or another municipal official or body possessing final policymaking authority over those actions. The identity of the final policymaker, the scope of any delegated authority, and the existence of any authorization, approval, or adoption are matters governed by applicable law and reflected in records principally within Defendant's possession, custody, or control. Plaintiff does not rely upon Mary B. Richardson-Lowry's supervisory title alone as establishing final policymaking authority.

56. Plaintiff's municipal-liability claim is based principally upon an alleged official decision, the exercise of delegated final policymaking authority, or the authorization or adoption of the challenged conduct by an official possessing final policymaking authority. Plaintiff alleges that the participation of multiple Department of Law attorneys, the use of City litigation processes and information, the alleged communications with other City personnel or governmental entities, and the continuation of the challenged conduct over time plausibly support the inference that the actions alleged herein were not merely unauthorized personal acts wholly unrelated to municipal business.

57. In the alternative, Plaintiff alleges that an official possessing final policymaking authority had actual knowledge of both the material conduct and its retaliatory purpose and thereafter approved or adopted the challenged decision as municipal policy. Plaintiff does not rely upon a mere failure to discipline an employee after the fact as sufficient, by itself, to establish municipal ratification.

58. The precise allocation and delegation of final authority, the identity of the decisionmaker, the communications presented for approval, and the nature of any authorization or adoption are matters governed by state and municipal law and reflected in records principally within Defendant's possession. Plaintiff alleges alternative municipal-liability theories to the extent permitted by the Federal Rules of Civil Procedure.

59. The official decision, exercise of delegated final authority, or authorization or adoption alleged above constituted action attributable to the City itself. Plaintiff alleges that this municipal action caused and was the moving force behind the retaliatory use of governmental authority and the resulting deprivation of his First Amendment rights.

60. In the alternative, and only to the extent supported by facts developed through permissible discovery, Plaintiff alleges that the challenged conduct may have reflected a persistent municipal practice of using governmental or litigation authority to retaliate against current or former City employees who pursued litigation, petitions, or reports of governmental misconduct.

61. Plaintiff presently lacks access to the internal complaints, directives, disciplinary records, litigation records, and communications necessary to determine whether sufficiently similar incidents occurred with the frequency required to establish a widespread municipal practice. Plaintiff therefore does not rely solely upon the incident alleged in this Complaint as proof that a widespread practice already existed.

62. Plaintiff pleads the widespread-practice theory in the alternative based upon the alleged participation of multiple governmental actors and departments and requests that the theory proceed only to the extent the Court determines that the specific factual allegations plausibly support it. Plaintiff's principal municipal-liability theory remains that the challenged conduct resulted from an official decision, delegated final authority, or authorization or adoption by a final policymaker.

63. As a direct and proximate result of Defendant's unconstitutional conduct, Plaintiff suffered substantial economic and non-economic injuries, including loss of employment, past and future lost wages and employment benefits, diminished earning capacity, loss of employment opportunities, medical and treatment expenses, emotional distress, mental anguish, humiliation, reputational harm, impairment of his constitutional rights, and other compensable injuries. Plaintiff further alleges that Defendant's conduct caused or substantially contributed to his hospitalization, continuing medical and psychological treatment, and other past and future damages recoverable under applicable law.

## COUNT II
### 42 U.S.C. § 1983 — FOURTH AMENDMENT UNREASONABLE SEARCH AND MUNICIPAL LIABILITY

64. Plaintiff realleges and incorporates paragraphs 1 through 63 as though fully set forth herein.

65. During the March 19, 2025 deposition, City attorneys discussed specific Internet searches that Plaintiff had conducted, including repeated searches concerning Paycheck Protection Program loans and a search asking whether Chicago was the most corrupt city in the world.

66. Before the deposition, Plaintiff had not disclosed those specific queries to Defendant's attorneys, produced his search history or browser records in discovery, publicly posted the queries, or authorized any third party to disclose them to the City. Plaintiff also had received no discovery request, subpoena notice, warrant notice, or other communication indicating that records containing those queries had been sought or obtained.

67. The information discussed during the deposition identified the substance and apparent pattern of particular questions Plaintiff had privately entered into an Internet search service and was sufficiently specific to plausibly support the inference that it was derived from records or other information reflecting Plaintiff's actual search activity, rather than merely generalized knowledge of subjects in which Plaintiff had expressed interest.

68. The specificity of the queries, Plaintiff's nondisclosure of them, the absence of any discovery request, subpoena, or other litigation process seeking such information, and their discussion in conjunction with statements concerning governmental investigations plausibly support the inference that one or more governmental actors acquired or accessed records reflecting Plaintiff's nonpublic Internet-search activity before the March 19, 2025 deposition.

69. Plaintiff alleges upon information and belief that City personnel requested, directed, facilitated, participated in, or acted jointly with another governmental actor in obtaining or accessing records reflecting Plaintiff's nonpublic Internet-search activity. In the alternative, Plaintiff alleges that another governmental actor obtained or accessed those records and transmitted them to City personnel pursuant to coordinated governmental investigative or information-sharing activity.

70. Plaintiff did not consent to governmental access to or acquisition of the records and received no notice of a warrant, subpoena, court order, discovery request, or other legal process authorizing such access or acquisition. Plaintiff alleges upon information and belief that the records were obtained or accessed without a warrant or other constitutionally sufficient authorization.

71. Plaintiff alleges that governmental access to or acquisition of records revealing the content and pattern of his specific nonpublic Internet-search queries constituted a search within the meaning of the Fourth Amendment because, to the extent those records disclosed the substance of Plaintiff's private intellectual inquiries, they were obtained through access to a source in

which Plaintiff maintained a reasonable expectation of privacy or another constitutionally protected interest.

72. Plaintiff does not presently know whether the records were obtained from his electronic device, browser, online account, search-engine account, provider records, synchronized data, another governmental entity, or another source. Plaintiff further does not presently know whether the information consisted of stored search-history content, account records, device-extracted data, provider-generated records, or another form of digital information. The source, method, scope, acquiring entity, requesting officials, and asserted legal authorization are matters principally within governmental possession, custody, or control.

73. Plaintiff alleges that the governmental search was unreasonable because it was conducted without his consent, without a warrant supported by probable cause, and without another constitutionally sufficient basis. Plaintiff acknowledges that the constitutional analysis may depend upon the nature of the records, the source from which they were obtained, the manner in which they were acquired, the extent to which they had been disclosed to a third party, and the scope and duration of the governmental access.

74. After the alleged acquisition or access, City personnel received, reviewed, discussed, relied upon, disclosed, or used the information during an official deposition conducted on behalf of the City of Chicago and, upon information and belief, in furtherance of the retaliatory conduct alleged throughout this Complaint. Plaintiff alleges those subsequent actions as evidence of City participation, causation, municipal authorization, and resulting injury, rather than as independent Fourth Amendment searches unless the evidence establishes additional governmental access to constitutionally protected information.

75. Plaintiff alleges upon information and belief that the alleged governmental access to or acquisition of Plaintiff's nonpublic digital information was undertaken pursuant to an official municipal decision, an exercise of delegated final policymaking authority, or authorization or adoption by an official possessing final policymaking authority. Alternatively, Plaintiff alleges that a final policymaker directed or approved City participation in a coordinated governmental process through which the records were obtained or accessed and transmitted for official municipal use.

76. The official municipal decision, exercise of delegated final authority, or authorization or adoption alleged above caused and was the moving force behind the alleged unreasonable search and resulting deprivation of Plaintiff's Fourth Amendment rights.

77. As a direct and proximate result, Plaintiff suffered invasion of privacy, fear of criminal investigation and prosecution, emotional distress, mental anguish, impairment of his constitutional rights, and other compensable injuries.

## COUNT III
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

78. Plaintiff realleges and incorporates paragraphs 1 through 77.

79. At all relevant times, Plaintiff maintained an ongoing employment relationship with Northwestern Medicine and possessed a valid and reasonable expectancy that the relationship would continue. That expectancy was based upon Plaintiff's active employment, established work history, continued performance of his duties, and the absence of any previously announced decision by Northwestern Medicine to terminate his employment.

80. Defendant knew of Plaintiff's employment relationship and reasonable expectancy of continued employment because Plaintiff identified Northwestern Medicine as his then-current employer in written discovery. During the March 19, 2025 deposition, City attorneys also demonstrated knowledge of Plaintiff's employment, Security Manager Vincent Page, and information concerning Plaintiff's standing within Northwestern Medicine that Plaintiff had not supplied to Defendant.

81. During the deposition, Assistant Corporation Counsel Tiffani E. Mims stated, in substance, "No one likes you at Northwestern Medicine." The specificity of that statement, the reference to Security Manager Vincent Page, and the surrounding discussion plausibly support the inference that City personnel had communicated with Northwestern Medicine personnel or received employment-related information from them before the deposition.

82. Plaintiff alleges upon information and belief that City personnel intentionally communicated with, supplied information to, solicited information from, or otherwise acted in coordination with Northwestern Medicine personnel concerning Plaintiff. Based upon the statements and circumstances alleged above, Plaintiff further alleges that those communications concerned Plaintiff's employment, professional standing, alleged misconduct, or suitability for continued employment and were undertaken for the purpose of destabilizing or adversely affecting his employment relationship.

83. Defendant's alleged interference was directed toward Northwestern Medicine and was undertaken for the purpose of affecting Northwestern Medicine's relationship with Plaintiff. The participants, precise contents, dates, methods, and recipients of the communications are presently within Defendant's and Northwestern Medicine's possession, custody, or control.

84. Defendant's interference was intentional and unjustified because it was undertaken to retaliate against Plaintiff for pursuing litigation and petitioning governmental bodies, to intimidate him, and to damage his employment and livelihood—not to advance a legitimate litigation, discovery, evidentiary, law-enforcement, or municipal purpose.

85. Defendant intended its alleged interference to jeopardize or disrupt Plaintiff's reasonable expectancy of continued employment, or acted with knowledge that such a result was substantially certain to occur.

86. The alleged communications and coordinated conduct materially destabilized Plaintiff's employment relationship and created an objectively reasonable fear that continued employment would subject him to additional governmental accusations, reputational injury, adverse employment consequences, or further interference with his livelihood.

87. On April 1, 2025, thirteen days after the deposition, Plaintiff resigned from Northwestern Medicine. Plaintiff alleges that Defendant's intentional interference was a direct and substantial factor in making the continued employment relationship untenable and in preventing Plaintiff's reasonable expectancy of continued employment from being fulfilled.

88. But for Defendant's intentional and unjustified interference, Plaintiff alleges that his employment relationship with Northwestern Medicine had a reasonable probability of continuing and that he would not have resigned on April 1, 2025.

89. As a direct and proximate result of Defendant's intentional and unjustified interference, Plaintiff lost the reasonable expectancy of continued employment with Northwestern Medicine and suffered substantial economic and noneconomic harm. Those damages include past and future lost wages, lost employment benefits, diminished earning capacity, loss of promotional and advancement opportunities, loss of future employment opportunities, damage to Plaintiff's professional reputation, and reasonable expenses incurred in seeking replacement employment. Plaintiff further suffered emotional distress, anxiety, humiliation, loss of professional confidence, disruption of his career trajectory, and other injuries resulting from the loss and destabilization of his employment relationship. Plaintiff alleges that these injuries were the natural and foreseeable consequences of Defendant's interference and would not have occurred in the same manner absent Defendant's conduct.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

90. Plaintiff realleges and incorporates paragraphs 1 through 89.

91. Defendant, acting through its attorneys, employees, and agents, allegedly engaged in a continuing course of threats, intimidation, retaliation, and employment interference.

92. The alleged conduct was extreme and outrageous because City attorneys and other personnel used actual or apparent governmental authority and an official judicial proceeding to state that the FBI was "going after" Plaintiff, that efforts had been made to arrest him, that criminal charges were being considered, and that his children would be left "orphans," while demonstrating possession of apparently nonpublic information concerning his residence, personal history, Internet activity, firearms, taxes, and employment.

93. The alleged conduct was especially extreme and outrageous because the challenged statements were allegedly made during an official deposition by attorneys representing the City of Chicago while acting under color of state law and performing official governmental functions. Plaintiff reasonably understood the statements as conveying the authority and power of government rather than the personal views of private individuals. Plaintiff alleges that references to FBI involvement, criminal investigation, arrest, prosecution, his children, and allegedly nonpublic personal information were intended to exploit the coercive authority of government to intimidate him, discourage him from continuing to exercise his constitutional rights, interfere with his employment, and inflict severe emotional distress.

94. Plaintiff does not base this claim merely upon harsh, insulting, or otherwise privileged advocacy pertinent to pending litigation. He alleges that City personnel used the deposition as a vehicle to communicate threats of arrest, prosecution, governmental investigation, consequences affecting his children, and employment interference; invoked information allegedly obtained outside lawful litigation processes; and participated in related conduct extending beyond the deposition. Plaintiff alleges that such conduct lacked any legitimate relationship to examining a witness, obtaining admissible evidence, defending the underlying action, or performing another proper litigation function.

95. Defendant knew that Plaintiff had requested disability-related accommodations and suffered from documented mental-health conditions that made him particularly susceptible to serious emotional injury.

96. Defendant intended to cause severe emotional distress or acted with knowledge that there was a high probability its conduct would do so.

97. Two days after the March 19, 2025 deposition, Plaintiff was hospitalized for suicidal ideation and depression. Plaintiff alleges that Defendant's conduct was a substantial factor contributing to

that hospitalization, his subsequent resignation, continuing emotional distress, and related injuries.

98. Plaintiff's emotional distress was severe and included depression, fear, panic symptoms, sleeplessness, humiliation, mental anguish, impairment of daily functioning, and the need for hospitalization and continuing treatment.

99. As a direct and proximate result of Defendant's alleged conduct, Plaintiff suffered severe emotional distress and the economic and non-economic damages alleged throughout this Complaint.

100. The alleged conduct was intentional, malicious, retaliatory, and undertaken with knowledge of the high probability that it would cause severe emotional injury. Plaintiff seeks recovery from the City to the extent permitted by Illinois law for actionable conduct committed by its employees within the scope of their employment.

101. Plaintiff further alleges that City personnel knowingly invoked actual or apparent governmental authority to retaliate against Plaintiff for engaging in activity protected by the First Amendment and that such conduct was authorized, approved, directed, adopted, or knowingly ratified by officials acting within the scope of their authority.

**COUNT V**
**ILLINOIS CIVIL CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

102. Plaintiff realleges and incorporates paragraphs 1 through 101.

103. Plaintiff alleges, upon information and belief, that one or more employees or agents of the City of Chicago knowingly reached an agreement, mutual understanding, or tacit meeting of the minds with one or more persons affiliated with legally separate governmental or law-enforcement entities to engage in coordinated conduct directed at Plaintiff. The object of the alleged agreement was to interfere intentionally and without justification with Plaintiff's employment relationship, reasonable expectancy of continued employment, and prospective economic advantage, and to subject Plaintiff to extreme and outrageous threats, intimidation, and asserted governmental pressure with the intent to cause, or with knowledge of the high probability of causing, severe emotional distress. Plaintiff alleges that retaliation for his exercise of rights protected by the First Amendment supplied the participants' common motive, but the actionable objects of the conspiracy were the Illinois torts alleged in Counts III and IV.

104. Plaintiff's allegation of an agreement is based not upon speculation or the mere occurrence of parallel events, but upon the totality of the specific factual circumstances alleged throughout this Complaint. Those circumstances include repeated references during the March 19, 2025 deposition to FBI involvement, federal and state criminal investigations, alleged efforts to have Plaintiff arrested, Plaintiff's personal tax matters, Plaintiff's private Internet-search activity, Plaintiff's residence and personal possessions, information concerning Plaintiff's employment at Northwestern Medicine, and the subsequent FOID-related communication and police activity observed by Plaintiff. Plaintiff alleges that, when considered collectively and in chronological sequence, those facts plausibly support an inference of coordinated action rather than independent coincidence.

105. Plaintiff further alleges, upon information and belief, that City personnel knowingly exchanged information, requested or provided investigative assistance, communicated regarding Plaintiff, or otherwise acted in concert with personnel affiliated with one or more legally separate governmental entities. Plaintiff does not presently know the identity of every participant, the precise dates of each communication, or the exact contents of the agreement because those matters are principally within Defendant's and the other governmental entities' possession, custody, or control and are expected to be established through discovery.

106. In furtherance of the alleged agreement, one or more participants committed overt acts, including: (a) communicating the statements made during the March 19, 2025 deposition concerning FBI involvement, criminal investigation, prosecution, arrest, and consequences affecting Plaintiff's children; (b) obtaining, exchanging, discussing, or using information concerning Plaintiff's nonpublic Internet-search activity, residence, possessions, personal history, or other private matters; (c) communicating with or exchanging information with Northwestern Medicine personnel concerning Plaintiff's employment or professional standing; (d) sending or facilitating the April 29, 2025 FOID-related communication threatening criminal charges; and (e) undertaking the additional coordinated acts alleged throughout this Complaint. Plaintiff alleges that these acts furthered the common tortious objectives of destabilizing and interfering with his employment relationship and intentionally or knowingly causing him severe emotional distress.

107. Plaintiff alleges that the overt acts undertaken pursuant to the agreement directly advanced and effectuated the underlying tortious conduct alleged in Counts III and IV. The alleged communications concerning Plaintiff's employment furthered the intentional interference with his employment relationship and prospective economic advantage, while the coordinated invocation of criminal investigation, prosecution, arrest, private information, firearms restrictions, and consequences affecting Plaintiff's children furthered the alleged intentional infliction of severe emotional distress.

108. Plaintiff's civil-conspiracy claim is derivative of the underlying Illinois torts of tortious interference with prospective economic advantage and intentional infliction of emotional distress alleged in Counts III and IV. Plaintiff does not assert civil conspiracy as an independent tort and does not rely upon the alleged constitutional violations, standing alone, as the underlying wrongful conduct supporting this Count.

109. As a direct and proximate result of the alleged agreement and the overt acts committed in furtherance of it, Plaintiff suffered the loss and destabilization of his employment relationship, hospitalization, severe emotional distress, fear of criminal prosecution, economic losses, and the other injuries and damages alleged throughout this Complaint.

## CONCLUSION

110. Plaintiff alleges that Defendant City of Chicago, acting through its officials, attorneys, employees, agents, and departments under color of state law, used actual or apparent governmental authority to retaliate against Plaintiff for exercising rights protected by the First Amendment; participated in or caused the alleged unlawful governmental access to or acquisition of Plaintiff's private digital information in violation of the Fourth Amendment and thereafter received, disclosed, or used that information; interfered with Plaintiff's employment and economic expectancy; intentionally inflicted severe emotional distress; and participated in the related tortious conduct alleged throughout this Complaint. Plaintiff further alleges that the challenged constitutional conduct resulted from an official municipal decision, the exercise of delegated final policymaking authority, or the authorization, approval, or adoption of an official possessing final policymaking authority, thereby giving rise to municipal liability under 42 U.S.C. § 1983.

111. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered constitutional, economic, medical, emotional, and reputational injuries, including hospitalization, loss of employment, diminished earning capacity, lost wages and benefits, medical expenses, emotional distress, mental anguish, and continuing psychological harm. Plaintiff therefore seeks judgment against Defendant and all relief authorized by federal and Illinois law, including compensatory damages, taxable costs, reasonable attorney's fees to the extent authorized by law, pre- and post-judgment interest as permitted by law, and such other legal or equitable relief as the Court determines is just, proper, and supported by the evidence.

**WHEREFORE**, Plaintiff MARCOS SANCHEZ respectfully requests that this Court enter judgment in his favor and against Defendant CITY OF CHICAGO and grant the following relief:

A. Award Plaintiff compensatory damages in the amount of Twenty-Five Million Dollars ($25,000,000.00), or such greater or lesser amount as may be determined by the evidence and awarded by the jury;

B. Award damages for past and future lost wages, lost earning capacity, loss of employment opportunities, loss of benefits, and other economic losses;

C. Award damages for emotional distress, mental anguish, humiliation, pain and suffering, damage to reputation, medical expenses, and other non-economic injuries recoverable under applicable law;

D. Award pre-judgment and post-judgment interest as permitted by law;

E. Award Plaintiff taxable costs, litigation expenses, and reasonable attorney's fees to the extent authorized by law, including any attorney's fees incurred if licensed counsel later enters an appearance on Plaintiff's behalf in this action;

F. Award such equitable relief, if any, as is authorized by law, supported by the evidence, and within the Court's jurisdiction;

G. Award such additional legal and equitable relief as may be authorized by federal or Illinois law and supported by the evidence; and

H. Grant such other and further relief as this Court deems just, equitable, and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable as a matter of right.

Respectfully submitted,

/s/ Marcos Sanchez
Marcos Sanchez
Plaintiff, Pro Se
P.O. Box 59250
Schaumburg, Illinois 60159

Dated: August 3, 2026